UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSHUA HOWARD,

                        Plaintiff,

        v.                                    Case No. 17-cv-1353-pp

TONY MELI, JEREMY WESTRA,
and CYNTHIA RADTKE,

                        Defendants.

**ORDER OVERRULING PLAINTIFF'S OBJECTIONS TO JUDGE JOSEPH'S NOVEMBER 22, 2019 ORDER (DKT. NO. 63) AND REQUIRING PLAINTIFF TO RESPOND TO THE DEFENDANTS' SUMMARY JUDGMENT**

        Joshua Howard, a Wisconsin state prisoner representing himself, filed this civil rights case under 42 U.S.C. §1983. He alleges that the defendants transferred him from Waupun Correctional Institution to Green Bay Correctional Institution in 2017 in retaliation for helping inmate Kristopher Torgerson with a civil case. Dkt. Nos. 15, 16. On October 9, 2019, the court referred the case to Magistrate Judge Nancy Joseph for pretrial proceedings. Dkt. No. 62. On November 22, 2019, Judge Joseph issued an order denying the plaintiff's motion and supplemental motion to compel discovery, granting the defendants' motion for protective order as to Exhibits A and B and granting the defendants' motion to strike Exhibit C. Dkt. No. 63. The court received the plaintiff's objections to Judge Joseph's order on December 16, 2019. Dkt. No. 64.

1

A party must object to a magistrate judge's order on a non-dispositive motion within fourteen days after being served with a copy of the order.[1] See Fed. R. Civ. P. 72(a). "The court must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Id. "The clear error standard means that the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made." Weeks v. Samsung Heavy Industries Co., Ltd., 126 F.3d 926, 943 (7th Cir. 1997). See also United States v. Cloyd, No. 18-cv-196-pp, 2020 WL 806645, at *22 (E.D. Wis. Feb. 18, 2020).

## I.    The Plaintiff's Allegations

This court recited the following facts the plaintiff alleged in support of his claim that defendants Meli (the security director at Waupun), Westra (a security captain at Waupun) and Radtke (another security captain at Waupun) retaliated against him for exercising his First Amendment rights:

> The plaintiff alleges that he has been diagnosed with "Social Anxiety Disorder with Paruresis." He also alleges that, at an early age, he was diagnosed with Gynephobia and that this diagnosis prevents him from using the bathroom in front of others. In addition, the plaintiff states that he has an irrational fear of taking showers in view of others, even those also taking showers.
>
> The plaintiff alleges that in 2015, the defendants referred him for a transfer to the Wisconsin Secure Program Facility (WSPF) and that he was ultimately "PRC'd" to WSPF. But WCI security staff withdrew

---

[1] The plaintiff filed a cover letter with his objections stating that he received the court's November 22, 2019 decision on November 27, 2019. Dkt. No. 64-1. He then had fourteen days—until December 11, 2019—to timely file his objections. Under Fed. R. Civ. P. 6(d), the court adds three days because service was made by mail; this means that the plaintiff had until December 16, 2019 to object. The plaintiff timely filed his objections.

the referral to WSPF based on the plaintiff's condition. Staff determined that WSPF was not a suitable prison because the "facilities" there are "open" compared to other maximum security institutions.

The plaintiff alleges that he has been assisting another inmate with a lawsuit against defendants Meli, Westra, and Radtke. On June 15, 2017, the defendants answered interrogatories that the plaintiff had drafted for the inmate's case. The following week, defendant Westra had the plaintiff brought to the security offices at WCI. Westra asked the plaintiff about the other inmate's lawsuit and the plaintiff's relationship with the inmate. Westra also said that he was considering transferring the plaintiff out of WCI. The plaintiff stated that he wanted to remain there.

The plaintiff alleges that in July 2017, he had his routine program review hearing, and he was placed at WCI for another year. On September 26, 2017, however, the plaintiff received an emergency pass to see his social worker, who told him that "Security" had scheduled an emergency program review hearing so he could be transferred to GBCI. The plaintiff wrote to the psychological services unit (PSU), informed them of the pending transfer, and asked why GBCI had not been placed in the same category as WSPF since the showers at GBCI have chest-high dividers and the inmates' upper bodies are exposed to each other.

On September 29, 2017, the plaintiff had the review hearing; defendant Radtke was the security officer present there. The plaintiff told the committee that he did not understand why he needed to be transferred—nothing had changed since the July hearing. He objected to being transferred to GBCI given his diagnosis, and he gave the committee several pages from his PSU file to corroborate his diagnosis and to show the issues that had arisen when the 2015 transfer to WSPF had been considered. The plaintiff says the committee handed the papers around the room, and he asked the committee to reschedule the hearing so that the PSU could weigh in on the proposed transfer. The committee declined to reschedule the hearing and approved the transfer to GBCI, despite the plaintiff's objection. The plaintiff says that he was visibly distraught when he left the hearing. Defendant Radtke escorted him to the pass officer's desk, and when the plaintiff did not say anything, Radtke said, "well at least you will have less people asking you for help in filing lawsuits at Green Bay."

The plaintiff alleges that defendant Radtke knew of the plaintiff's condition prior to approving the transfer. He also alleges that

3

defendants Meli and Westra knew of his condition in 2015 when the plaintiff's transfer to WSPF was rescinded.

The plaintiff alleges that the defendants conspired to have him transferred to GBCI on an emergency basis for the dual purposes of (a) punishing him for prosecuting the other inmate's case. Dkt. No. 8 at 3-6 (b) impeding any further assistance he might provide due to the mental and emotional deterioration he alleges was guaranteed to follow his transfer to GBCI. He asserts that such retaliation violated his rights under the First Amendment.

Dkt. No. 8 at 3-6 (record citations and footnotes omitted).

## II. Plaintiff's Motion to Compel (Dkt. No. 47), Defendants' Motion for Protective Order and to Strike (Dkt. No. 57), Judge Joseph's Order Addressing the Motions (Dkt. No. 63) and Plaintiff's Objections (Dkt. No. 64)

The plaintiff filed a motion to compel asking the court to order the defendants to produce the following materials: (1) any communications or emails in which the defendants discussed Kristopher Torgerson or his lawsuit against the defendants, as well as any documents or emails which "mention or discuss" both Torgerson and the plaintiff[2]; (2) any materials related to the 2016 inter-institutional transfer of the plaintiff including, but not limited to, an email attachment to DOC-051, any documents generated from Torgerson's ICRS complaint about the transfer, the cell hall logs from the transfer date if they referenced the plaintiff, and any emails where the defendants referenced the transfer; and (3) any materials related to the transfer of inmates Ralph Armstrong, Tobarus Porter and Yusef Williams from Green Bay. Dkt. No. 47.

_____

[2] In her ruling, Judge Joseph stated that the motion to compel sought emails related to Torgerson's *criminal* case. Dkt. No. 63 at 2. That is incorrect; the motion sought emails in which the defendants discussed Torgerson or his civil lawsuit against the defendants, or any emails at all referencing the plaintiff and Torgerson.

4

A.    Emails Related to Inmate Torgerson's Case or Mentioning Plaintiff
      and Inmate Torgerson

The plaintiff said that he made two requests of the defendants, asking for
"all communication and e-mails involving the defendants discussing inmate
Kristopher Torgerson or his lawsuit against the defendants" and "all documents
and e-mails which mention or discuss both inmate Kristopher Torgerson and
the plaintiff." Dkt. No. 47 at 5. He indicated that he'd asked for these emails
because while the defendants had asserted that they didn't know that the
plaintiff was helping Torgerson with his *civil* lawsuit, "AAG Richard Dufour"
stated that that "[w]e" had found out that the plaintiff was helping Torgerson or
a friend "in some civil matters as a jailhouse lawyer." Id. at 6 (citing the
defendants' proposed findings of fact). The plaintiff asserted that Dufour—who,
the defendants explain, was the prosecutor in Torgerson's criminal case—
completed that prosecution in March of 2017; he concludes that as of that
date, Dufour knew that the plaintiff was helping Torgerson with his lawsuit
against the defendants, "while the defendants contend that they were not
aware that the plaintiff was assisting Torgerson until the instant action was
filed [in October 2017]." Id. The plaintiff asserted that this made any
communication between Dufour and the defendants "extremely relevant
considering that they may contain evidence that parties discussed the
plaintiff's assistance in Torgerson's lawsuit against the defendants months
prior to his transfer [which occurred sometime after September 2017]." Id.

The defendants objected to the initial discovery request as overly broad, unduly burdensome, not proportional to the needs of the case and irrelevant.[3] Dkt. No. 50 at 2. They also objected because the only responsive emails they retrieved pertained to inmate Torgerson's *criminal* case, and thus were irrelevant to the plaintiff's allegations that the defendants retaliated against him for helping Torgerson with Torgerson's *civil* lawsuit. Id.

The defendants provided with their response to the motion to compel a single email, filed under seal. Exhibit A, Dkt. No. 51-1. The email mentions the plaintiff and Torgerson, but it is dated March 13, 2018—*after* the plaintiff was transferred. The defendants also provided a different string of emails, also filed under seal. Exhibit B, Dkt. No. 51-2. While the plaintiff and Torgerson are referenced in the email chain, there is no reference to the plaintiff helping Torgerson with a civil case against the defendants—no reference to a civil case at all—and nothing to indicate that anyone involved in the email chain was frustrated with the plaintiff or wanted to punish him or retaliate against him.

The defendants filed a motion for protective order as to Exhibits A and B. Dkt. No. 57. They argued that Exhibit A should remain under seal because, if it were unsealed, it could threaten the safety of a different, unrelated inmate

---

[3] The defendants stated that, near the start of this case, the Department of Corrections had conducted a search for emails in the three defendants' email accounts using the search terms "Howard" or Howard's DOC number. Dkt. No. 50 at 2 n.1. The defendants explained that the search resulted in 2,611 potentially responsive emails which took a substantial amount of time to review. Id. They indicated that their objections that the requests were overly broad, burdensome and disproportional were based on the sheer number of emails the defendants needed to weed through to find potentially relevant emails. Id.

mentioned in the email, as well as other inmates, staff and the institution. Id. at 2. The defendants argued that Exhibit B should remain under seal because the court already had ordered sealed a document with similar content; they also offered to provide the plaintiff with the exhibit in redacted from. Id. In response to the defendants' motion for protective order, the plaintiff stated that he did not object to sealing Exhibit A because the defendants had provided good cause to do so, and that he did not object to the disclosure of Exhibit B to him in redacted form. Dkt. No. 61.

Judge Joseph denied the plaintiff's motion to compel the production of the emails mentioning the plaintiff and inmate Torgerson and granted the defendants' motion for a protective order as to Exhibits A and B. Dkt. No. 63 at 7. Judge Joseph reasoned that the defendants had complied with the plaintiff's discovery demands by providing the emails responsive to those discovery demands to the court under seal, (Exhibits A and B), the plaintiff had not objected to Exhibits A and B remaining under seal and the defendants had shown good cause for keeping them under seal. Id. at 7-8.

In his objections, the plaintiff references Exhibit A and he says that the March 13, 2018 email which references him, inmate Torgerson and their "case" is relevant to the subject matter of his claim in that it meets the "extremely broad" test for relevance. Dkt. No. 64 at 1. He cites to AM Int'l, Inc. v. Eastman Kodak Co., 100 F.R.D. 255, 257 (N.D. Ill. 1981), in which the court stated that the test for relevance in the discovery area is "an extremely broad one." Id.

The court will overrule the plaintiff's objections. First, he misstates the relevance standard for discovery. He is correct about the holding in AM International; in that decision, the Northern District of Illinois quoted Wright and Miller's Federal Practice & Procedure in stating that "'[I]t is not too strong to say that a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action.'" Id. at 257. But that case was decided in 1981. In 1983, the rules were amended; Fed. R. Civ. P. 26(b)(1) was "amended to add a sentence to deal with the problem of over-discovery." Advisory Committee Notes to the 1983 Amendments to Rule 26(b)(1). "The new sentence [was] intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse." Id. The rule now reads,

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, *the importance of the discovery in resolving the issues*, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not me admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b) (emphasis added). It is no longer true that a request is relevant if there is *any possibility* that the information it seeks may be relevant. Now the request must be proportional, and a party must show, among other things, that the discovery is important in resolving the issues in the case.

The court has reviewed the document in Exhibit A. It cannot be relevant to show that the defendants retaliated against the plaintiff by transferring him,

because it was sent *after* the decision was made to transfer him and *after* he was transferred. It makes no mention of the plaintiff's transfer. It is not even about the plaintiff. It does not mention the plaintiff helping Torgerson. It is not, in any way, relevant to the plaintiff's claim that, months earlier, the defendants transferred the plaintiff to punish him for helping Torgerson prepare and file a civil lawsuit against the defendants.

Judge Joseph did not make a mistake in denying the plaintiff's motion to compel production of Exhibit A, and the court overrules the plaintiff's objection regarding Exhibit A.

The plaintiff did not mention Judge Joseph's ruling on Exhibit B in his objection; the court assumes that when he saw the redacted version, he realized that the email chain between Torgerson's prosecutor and others had nothing to do with the plaintiff's transfer. The court has reviewed that email chain; it had nothing to do with the plaintiff's transfer. The statement by Torgerson's prosecutor that the prosecution team had learned that the plaintiff was helping "Torgerson and/or a friend in some civil matters as a jailhouse lawyer" does not tend to make it more or less likely that the defendants in this case were aware that the plaintiff was helping Torgerson sue *them*, and *that* is the basis for the plaintiff's retaliation claim.

Judge Joseph did not make a clear error (or any error) in denying the motion to compel as to Exhibit B, and to the extent that the plaintiff intended to object to Judge Joseph's ruling regarding Exhibit B, the court overrules that objection.

B. Plaintiff's October 2016 Cell Hall Transfer

In his motion to compel, the plaintiff asserted that in August 2016 he
was housed on the same side of the South Cell Hall as Torgerson, which
enabled them to talk about filing a lawsuit against the defendants "several
times a day at meals, library and recreation." Dkt. No. 47 at 6. He complained,
however, that in the weeks after he drafted the civil complaint for Torgerson—
but a week before Torgerson's lawsuit was filed—the defendants moved the
plaintiff to the North Cell Hall, which meant he could communicate with
Torgerson only through mail monitored by the institution. Id. at 6-7. In
discovery, the plaintiff asked for "all documents and communication records
which discuss the plaintiff's transfer from cell H-35 in the SCH to cell K-22 in
the NCH." Id. at 7. He also served a request that stated, "DOC 051 is an email
from Captain Bauer containing an attachment, a copy of which was sent to
Defendant Westra. Please produce documents contained in the attachment of
this e-mail." Id. The plaintiff asserted that the defendants had objected to these
requests, arguing that they were not relevant and were outside the scope of the
claims on which the court had allowed the plaintiff to proceed; specifically
regarding the attachment to DOC 051, the defendants had indicated that that
attachment had to do with the plaintiff's transfer *within* the institution, not his
transfer from the institution to another facility (which is the basis of the
lawsuit). Id.

The plaintiff says that he responded, in essence, that moving him from
the South to the North Cell Hall was a first step in the process to prevent him

from helping Torgerson sue the defendants, and when that didn't work, the defendants transferred him out of the prison altogether. <u>Id.</u> at 7-8. He says that he followed up by expanding his request, specifying that his request for "any documents" related to this internal move included the cell hall logs for both the North and South Cell Halls for the date he was moved "and any other documentation of the move by the cell hall sergeants." <u>Id.</u> at 8.

In the motion to compel, the plaintiff asserted that the emails and cell hall logs were relevant because "they may show that the defendants ordered this move to separate the plaintiff from Torgerson, which would support the plaintiff's position that when the move failed to halt the progress of the action against them, they took more drastic action." <u>Id.</u> at 9. He also argued that although the defendants continued to assert that they didn't know the plaintiff was helping Torgerson sue them, "after the plaintiff was moved in October of 2016, Torgerson filed a complaint specifically alleging that the move was intended to prevent him from obtaining assistance in Case No. 16-cv-1432." <u>Id.</u> The plaintiff asserted that if the defendants were interviewed in relation to that complaint, or if the inmate complaint examiner had informally discussed the complaint with the defendants, it would explain why the inmate complaint examiner was "inexplicably" copied on emails related to the plaintiff's transfer. <u>Id.</u>

The defendants responded that the plaintiff's transfer within Waupun was irrelevant to his claims in this case. Dkt. No. 50 at 3. Specifically, the defendants asserted that they had explained to the plaintiff that "Torgerson's

11

lawsuit was not screened until December 1, 2016, almost four months *after* the cell hall transfer." Id. The defendants stated that they would not have learned that Torgerson had sued them until after the court had screened Torgerson's complaint. Id. Despite their objection, they provided the court with "the emails that [the plaintiff] seeks," filed under seal. Id. at 4; Dkt. No. 51-3, Exhibit C.

The plaintiff responded that Torgerson had e-filed his lawsuit on October 24, 2016. Dkt. No. 56 at 5. He claimed that he was "paired up" with Torgerson all the time—at every meal, library pass, cell hall and recreation—in the months before the cell hall transfer, and "it was apparent from their open conversations that they were discussing a lawsuit against the defendants." Id. He asserted that while the transfer may have occurred for some other reason, the emails and cell hall logs were relevant because one could draw an inference that the plaintiff was helping Torgerson and that the move was designed to thwart that assistance. Id. He found it "interesting" that the defendants had not submitted for the court's viewing any materials relating to Torgerson's inmate complaint about the plaintiff having been moved. Id. at 6.

In the motion for a protective order, the defendants asked Judge Joseph to strike Exhibit C. Dkt. No. 57 at 2-3. They repeated their objection that the emails in the exhibit were irrelevant to the subject of the lawsuit, arguing that the plaintiff should not be given access to an irrelevant document when the defendants had provided it only in defense of their motion. Id. The defendants opined that they should not have filed Exhibit C at all, and they asked the court to strike Exhibit C. Id. The plaintiff responded that he did not object to

Case 2:17-cv-01353-PP   Filed 08/04/20   Page 12 of 28   Document 68

Exhibit C "being withdrawn," but stated that he renewed his position that the emails should be disclosed due to relevance. Dkt. No. 61.

Judge Joseph denied the plaintiff's motion to compel "discovery related to [the plaintiff's] cell hall transfer which the defendants provided as Exhibit C," because the contents of that document showed that the plaintiff was transferred for reasons that had nothing to do with Torgerson. Dkt. No. 63 at 8. She also noted that the plaintiff had stated in his response to the defendants' motion for a protective order that he did not object to her striking Exhibit C. Id.

The plaintiff first objected to the fact that Judge Joseph's ruling mentions only Exhibit C—it did not discuss his request for the documents related to Torgerson's inmate complaint about the transfer. Dkt. No. 64 at 2, 3. He also points out that twice in her recitation of the facts, Judge Joseph repeated the defendants' assertion that Torgerson's civil lawsuit had not been screened until December 1, 2016, "almost four months after the cell hall transfer." Id. at 2 (citing Dkt. No. 63 at 4). The plaintiff asserted that he was transferred from the South to the North Cell Hall on October 17, 2016, which would have been six weeks (not four months) before Torgerson's complaint was screened on December 1, 2016. Id. He also argued that the relevant date upon which the defendants likely would have known that Torgerson sued them wasn't the date on which the court screened Torgerson's complaint, but the date on which Torgerson requested a legal loan and a copy of his certified trust account from the business office, which he asserts would have been "in the

Case 2:17-cv-01353-PP   Filed 08/04/20   Page 13 of 28   Document 68

weeks prior to the October 24, 2016 e-filing." Id. He alleged that Judge Joseph failed to respond to his correction of this error in his reply. Id. at 2-3.

The plaintiff also argued that Judge Joseph didn't address his request for documents related to Torgerson's inmate complaint about the plaintiff being moved. Id. He asserted that within fourteen days after the plaintiff was moved to the North Cell Hall, Torgerson filed a complaint alleging that the defendants had intentionally moved him away from the plaintiff so the plaintiff couldn't help Torgerson with his lawsuit. Id. The plaintiff asserted that the inmate complaint examiner, Muenchow, had "inexplicably emailed the Defendants about the plaintiff's transfer despite his sole designation as an Inmate Complaint Examiner." Id. The plaintiff wants to know whether Muenchow's decision on Torgerson's complaint references a conversation he had with the defendants in response to Torgerson's allegations, or whether Muenchow copied them on the decision, asserting that the documents "may demonstrate" that the defendants had notice of "the protected activity" a year before he was transferred to Green Bay. Id.

Judge Joseph did not commit clear error. She reviewed Exhibit C—a series of emails among Waupun staff about moving the plaintiff from the South Cell Hall—and concluded that the move had nothing to do with the plaintiff's helping Torgerson with Torgerson's lawsuit. The court has reviewed Exhibit C and agrees. The emails are dated October 4 and 10, 2016—two to three weeks before Torgerson filed his civil lawsuit, and months before Judge Adelman screened it. Dkt. No. 51-3, Torgerson v. Wall, et al., Case No. 16-cv-1432 (E.D.

Wis.). The inmate complaint examiner, Muenchow, is one of the staff members involved in the email chain, and the emails make clear that his involvement had nothing to do with Torgerson or Torgerson's ICE complaint (which would have to have been made between October 25 and November 8, 2016, weeks after the emails in Exhibit C).

The plaintiff's theory that at some point prior to Torgerson filing his civil lawsuit on October 25, 2016, he would have applied for a legal loan and asked for his inmate trust account and thus alerted the defendants to the fact that he was suing them, is at best speculation. Even if the Waupun business office knew that Torgerson had asked for a loan and his trust account statement, it would not necessarily have known the defendants Torgerson planned to sue or the subject of the lawsuit. And even if the business office had known, it does not follow that the security director and two security captains would have known.

Finally, the plaintiff never has explained how cell hall logs—which presumably would have shown when he left South Cell Hall and when he arrived at North Cell Hall—would have any relevance to his theory that the move was motivated by the defendants' desire to separate him from Torgerson.

The court overrules the plaintiff's objections to Judge Joseph's denial of the motion to compel production of various documents relating to his transfer from the South Cell Hall to the North Cell Hall.

## C. Documents Pertaining to Other Inmates

In the motion to compel, the plaintiff stated that in response to discovery requests, defendant Meli said he wanted the plaintiff transferred out of Waupun because during the plaintiff's fifteen-year stay there, he had become very familiar with staff, other inmates and the daily operation of the institution, and that Meli had "identified (3) inmates who had been similarly transferred but refused to provide any further information." Dkt. No. 47 at 10. The plaintiff said he responded by asking for the identity of those three inmates, and that Meli responded that the names that came to mind were Ralph Armstrong (at Waupun from 1981 to 2002), Tobarus Porter (at Waupun 2010 to 2017) and Yusef Williams (at Waupun 1996 to 2010). Id. The plaintiff said he then asked for information about those inmates—any documents discussing their transfers, including PRC[4] paperwork, emails between facilities and emails between staff discussing their transfers. Id. at 10-11. The plaintiff says the defendants objected that his request was overly broad, unduly burdensome, requested confidential information and was disproportional. Id. at 11. The plaintiff responded that he was required to show that the defendants' proffered reason for transferring him was pretextual and that he needed to show that the three inmates were not transferred for the reasons the defendants stated any more than he was. Id. He asked the court to compel the defendants to produce any materials related to the transfer of Armstrong, Porter and Williams from Waupun. Id. at 13.

---

[4] Program Reclassification Committee.

In response to the plaintiff's motion to compel, the defendants argued that the details relating to these other inmates are not relevant to why the plaintiff was transferred and that the request was too broad and was not proportional to the needs of the case. Dkt. No. 50 at 4-5.

The plaintiff replied with the bald assertion that "nobody has ever been moved by security for being at Waupun for too long." Dkt. No. 56 at 6. He reiterated that the defendants had refused to provide proof that Armstrong, Porter and Williams had been transferred for this reason, and asserted that if they had provided the requested information and it had failed to support their claims, that would show that they had "fabricated examples of similar moves in an attempt to cover up their improper motives." Id.

Judge Joseph denied the plaintiff's motion to compel the documents pertaining to the other inmates. Dkt. No. 63 at 8. She determined that the requested documents were not relevant and that even if Armstrong, Porter and Williams were not transferred because they had been at Waupun for a long time, that did not make it more or less likely that the defendants' stated reasons for transferring the *plaintiff* were pretextual and that the real reason was retaliation. Id.

In his objections, the plaintiff asks how emails and transfer documents cannot be considered relevant. Dkt. No. 64 at 5. He said he asked for the emails and transfer documents for those three inmates that he could refute that defendant Meli had transferred them for being at Waupun too long, which

Case 2:17-cv-01353-PP   Filed 08/04/20   Page 17 of 28   Document 68

would make it more likely that Meli's claim to have transferred the plaintiff for the same reason was a pretext. Id.

Judge Joseph did not commit clear error in denying the plaintiff's motion to compel production of documents about the transfers of Armstrong, Porter and Williams. The plaintiff's request layers speculation upon speculation. He speculates that no one has ever been moved from Waupun for becoming too familiar with the staff and procedures. He speculates that if he got the information about the transfer of these three inmates—information dating back *eighteen years* for one of them, *ten years* for another and *three* for the third—it would show that they were transferred by *these defendants*, and that they were transferred for reasons other than the length of time they'd been at Waupun.

Even if every one of those speculations proved true, it would not show that these defendants transferred the plaintiff to retaliate against him for helping Torgerson. The plaintiff has not sued these defendants for lying or being untruthful. He has sued them for retaliating against him for exercising his First Amendment rights. Maybe if he had some indication that the defendants had transferred other defendants in retaliation for exercising their First Amendment rights, there could be some possible relevance to transfer records of such defendants, but even then, the court would have to weigh the proportionality of the plaintiff's demands. His demands are entirely disproportional to the needs of this case.

The court overrules the plaintiff's objections to Judge Joseph's denial of the motion to compel records relating to the transfers of Armstrong, Porter and Williams.

D.    The Plaintiff's Reply: 2,611 Plaintiff-Related Emails

For the first time in his reply in support of his motion to compel, the plaintiff argued that the court should order the defendants to disclose the 2,611 plaintiff-related emails they referenced in their response to his motion (see Dkt. No. 50 at 2 n.1 ("The search resulted in 2,611 potentially responsive emails which took a substantial amount of time to review."). Dkt. No. 56 at 2-3. The plaintiff stated:

> [A]ll three defendants were placed in their supervisory positions at WCI in 2012, which was (5)+ years prior to the plaintiff's transfer. During this period the plaintiff was not under criminal investigation, the defendants have acknowledged that he has never been suspected of planning an escape or soliciting staff and he only received (5) conduct reports, (4) of which were minors. Despite this period being relatively uneventful, the defendants sent an average of (435) plaintiff-related emails per year. Even if these emails fail to directly implicate the defendants they show that their observation of the plaintiff was extensive and the plaintiff can use the more detailed emails and the sheer volume to demonstrate that given their seeming fixation on the plaintiff, it would be unlikely that they remained unaware that the plaintiff spent most of 2016 huddled up with Torgerson, preparing the lawsuit and all of 2017 corresponding with Torgerson and sending him paperwork for the lawsuit.

Id. The plaintiff ended the reply brief by "mov[ing] the Court to order that the Defendants disclose the (2,611) plaintiff-related emails . . . ." Id. at 7.

Judge Joseph found that the plaintiff's request that the defendants produce the "2,261"[5] emails was not properly before the court as a motion to compel and denied the request. Dkt. No. 63 at 8.

The plaintiff objected to Judge Joseph's determination that the 2,611 plaintiff-related emails were not properly before the court as a motion to compel. Dkt. No. 64 at 3-4. He argued that "the exculpatory number of emails was implicitly within his document requests and he specifically included them in his motion as soon as they were disclosed by the Defendants." Id. at 4. According to the plaintiff, the defendants' late disclosure of the existence of so many emails provided another potential way for him to establish that they had to have been aware of his assistance to Torgerson in the eighteen months prior to his transfer to Green Bay, given the fact that the three of them exchanged an average of 435 emails for every 365 days that they held their positions prior to the plaintiff's eviction. Id. at 3-4.

Judge Joseph certainly did not commit clear error in denying the plaintiff's demand that she order the defendants to turn over all 2,611 emails. The plaintiff did not make an appropriate discovery demand for these mails (despite his argument that the demand was "implied"). One cannot raise a discovery demand in a reply in support of a motion to compel. That is what the Federal Rules of Civil Procedure are for—to provide an orderly framework for parties to exchange discovery through interrogatories, requests for produce and

---

[5] This appears to be a typographical error—both the defendants and the plaintiff indicate that there were 2,611 emails, not 2,261.

20

requests for admission. Indeed, this court's Civil Local Rule 37 requires a party to confer in good faith with opposing counsel to try to work out discovery disputes before asking for the court's intervention, and to certify that he has done so. Judge Joseph would have violated the structure of the federal and local rules, and upended the discovery process entirely, had she ordered the defendants to produce discovery that the plaintiff had not even requested.

Even if the plaintiff had filed a discovery demand for every email the defendants ever exchanged that mentioned him, such a demand would have been overly broad. Given the number of years the defendants were at Waupun with the plaintiff, there could be any number of reasons his name would have come up in their mail exchanges—including the possibility that the plaintiff filed lots of inmate complaints requiring investigation by the defendants. The court notes that the plaintiff—an admitted "active litigant"—has filed nine civil suits here in the Eastern District since 2005, as well as a *habeas* petition. The court suspects the plaintiff was equally active in filing grievances at Waupun. The plaintiff's more narrow request that the defendants produce emails relating to Torgerson's civil lawsuit, or relating to the plaintiff and Torgerson, was much closer to the mark.

The court overrules the plaintiff's objections to Judge Joseph's denial of his motion to compel.

**III.    Plaintiff's Supplemental Motion to Compel (Dkt. No. 49), Judge Joseph's Order Addressing the Motion (Dkt. No. 63) and Plaintiff's Objections (Dkt. No. 64)**

In his supplemental motion to compel, filed three weeks after the first motion to compel, the plaintiff sought emails relating to what he characterized as an "aborted" transfer of him to the Wisconsin Secure Program Facility in 2015. Dkt. No. 49. He asked the court order the defendants and two non-parties, Mark Heise (Director of the Bureau of Offender Classification and Movement at the Department of Corrections) and Brian Greff (whose position the plaintiff does not identify), to produce: (1) any emails to which June Hunt was a party and which discussed the plaintiff's proposed 2015 transfer to the WSPF; (2) the May 22, 2015 email sent by defendant Meli, identified in the privilege log; and (3) the eleven emails involving defendants Meli, Mr. Heise and Mr. Greff identified in the non-party privilege log. Id. at 18.

The motion is eighteen pages long and, like the plaintiff's other filings, very detailed. The gist of the motion, however, is that the plaintiff had been scheduled to be transferred to the WSPF on April 7, 2015 on a recommendation to the Program Review Committee from defendant Meli. Id. at 2. The plaintiff appealed the transfer administratively on April 14, 2015, and the appeal was denied. Id. After a long description of many emails back and forth among many people (including defendant Meli), the plaintiff asserted that the referral to WSDF was "lifted." Id. at 3-4. He said that he believed that the Department of Justice made inquiries about the reason for the transfer and was "unsatisfied with the responses," so the DOJ ordered the transfer to be canceled "to

foreclose any future litigation by the plaintiff raising a retaliation claim." Id. at 3-4. He indicated that he also believed that the "defendants" plural (despite making no mention of defendants "intentionally rushed the transfer to GBCI in the hope that the DOJ would not learn of their actions and interfere." Id. at 4. He said that he made his discovery demands "[i]n an effort to discovery the reason for the aborted transfer . . . ." Id.

The defendants objected to providing emails related to the plaintiff's near-transfer to WSPF in 2015 on the grounds that they were not relevant to the plaintiff's 2017 transfer to Green Bay, which is the transfer at issue in this case. Dkt. No. 54 at 2; Dkt. No. 47-1 at 26. The defendants also asserted that the May 22, 2015 email was a privileged attorney-client communication. Dkt. No. 54 at 2. The defendants asserted that regarding the emails responsive to the subpoenas the plaintiff issued to Mark Heise and Brian Greff, either Heise or Greff had asserted attorney-client privilege regarding the eleven emails. Id. at 3-5. The defendants argued that the plaintiff's motion to compel production of these emails should be denied on that basis. Id. at 5. Finally, the defendants argued that the court should deny the plaintiff's motion to compel related to a subpoena the plaintiff issued to June Hunt because he failed to provide proper notice of the subpoena. Id. at 6.

Judge Joseph denied the plaintiff's supplemental motion to compel. Dkt. No. 63 at 14. She first determined that the defendants had not provided enough information for the court to conclude that the emails were privileged attorney-client communications. Id. at 12-13. Judge Joseph then turned to

23

relevance and she quoted a lengthy portion from the plaintiff's reply brief which explained his argument that emails related to his failed transfer to WSPF in 2015 were relevant to his claim in this case. Id. at 13-14. The court reproduces that quote here.

> The Defendants continue to argue against the relevancy of the aborted 2015 WSPF transfer to this action. The defendants admit that on 4.08.15, Chilsen informed them that the plaintiff's habeas hold did not prevent his transfer to WSPF. (P-Ex. P, Adm. 11 at 3-4) The defendants admit that in May of 2015 the DOJ made inquiries about the motivation for transfer and that in June of 2015 the Warden informed Meli that the DOJ wanted the transfer rescinded. (P-Ex. P, Adm. 9, 13 at 3-4) On 3.06.17, Meli stated in an email that he could not "move inmate Howard per litigation and the DOJ." (D-Ex. 1015 at 1) When the warden asked Meli who he had in mind for transfer to GBCI on 8.21.17, he responded, "[o]bviously Joshua Howard but I doubt the DOJ will let me move him." (P-Ex. X at 1) Despite this, the defendants state that they have "no recollection and/or knowledge" of the DOJ requesting that the transfer be rescinded, (P-Ex. D, Req. 2 at 2), and deny that the DOJ directed them to schedule a PRC hearing so that his placement could be changed from WSPF back to WCI or that the DOJ directed that the transfer be recalled due to its belief that it was improperly motivated. (P.-Ex. P, Adms. 14-16 at 4-5) Furthermore, Meli did not notify or contact the DOJ despite acknowledging that they would likely not allow the plaintiff to be transferred and only verified with the OLC that he did not have a habeas hold prior to his transfer. (D.-Ex. 1014)
>
> The defendants confirm that the 2017 GBCI transfer was issued for the same reasons as the attempted 2015 transfer, "as they had not abated." The defendants have tied the legitimacy of the 2017 transfer to that of the 2015 attempted transfer so it is relevant if the DOJ found that it reeked of retaliation and took the unusual step of vetoing a security transfer made by the Security Director of a DOC facility. It is also relevant to see what the defendants were told at the time as they continue to have no memory of the DOJ's intervention and repeatedly contend that the transfer was quashed due to the habeas hold.

Id. (quoting Dkt. No. 60 at 3-5). Judge Joseph concluded that this explanation did not show how what happened in 2015 could be relevant to the plaintiff's

claim that in 2017 the plaintiffs transferred him in retaliation for his helping Torgerson, or how discovery relating to the 2015 events could lead to information relevant to the allegations in this case. Dkt. No. 63 at 14.

The plaintiff objected to Judge Joseph's decision. Dkt. No. 64 at 5-7. He concedes that the emails concerning the WSPF transfer "are not directly related to the main reason that the plaintiff was transferred to Green Bay," but he asserts that this does not render them irrelevant. Id. at 5. The plaintiff explains that if the defendants attempted to transfer him in 2015 for filing a class action against them, this makes it more likely that they engaged in similar conduct in this case. Id. at 5. The plaintiff also objects to Judge Joseph's finding that the defendants' opposition to the subpoenas could be construed as "relevancy objections" to emails 2-4. Id. at 6. And the plaintiff contends that even if was proper for Meli to assert relevancy objections to documents subpoenaed from non-parties, no one can be said to have made relevancy objection to the remaining emails, 5-12. Id. at 6-7. He asserts that the subpoenaed documents must be produced as there is no other standing objection made by the non-parties. Id.

Judge Joseph did not err in concluding that the events surrounding the 2015 "aborted" transfer are not relevant to this case. Under Fed. R. Evid. 401, evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." The plaintiff has alleged in this case that the defendants transferred him to Green Bay in 2016 to retaliate against him for

25

helping Torgerson prepare a lawsuit against them in 2016. Nothing that happened in 2015 can make it more or less probable that in 2016, the defendants retaliated against the plaintiff for something he did in 2016.

The plaintiff appears to believe that this lawsuit is about the fact that the defendants transferred him without telling the truth about why they did it. Again, that is not the subject of this lawsuit, and if it were, it wouldn't be in federal court. It is not a federal offense, or a violation of the federal Constitution, for a prison official to transfer an inmate from one facility to the other and not tell the truth about the reason why. It might not be ethical for a prison official to lie about the reason for a transfer. But it is not a violation of federal law or the Constitution. The court allowed the plaintiff to proceed on a claim that the defendants retaliated against him for exercising his First Amendment free speech rights by helping Torgerson. *That* is the subject of the lawsuit, and the plaintiff is entitled to evidence that makes that fact more probable.

The defendant believes that the defendants are lying when they say they did not find out he was assisting Torgerson until after Judge Adelman screened Torgerson's civil rights complaint. He believes that they are lying when they say they moved him because he had become too familiar with WCI staff and procedures. He wants to show that the defendants are liars, and believes that any evidence showing that they are liars, no matter how attenuated, will show that the *real* reason they transferred him was to retaliate against him for helping Torgerson sue them. His reach is too broad. Even if the evidence the

plaintiff seeks proved that any of these defendants had lied—and the court confesses that it is mystifies as to how it could—that evidence would not be admissible to show their character as liars; Fed. R. Evid. 404(a)(1) prohibits admitting evidence of a person's character trait to show that on a particular occasion, that person acted in accordance with that trait. And while it is true that under Rule 26(b)(1), a party does not have to show that evidence is admissible, in this case, the fact that the evidence would be inadmissible supports the court's conclusion that it would be unduly burdensome to require the defendants to produce the evidence.

All of the other arguments between the parties—the issue of whether subpoenas to non-parties were proper, and whether certain documents were privileged—fall to the wayside in the face of the fact that whatever did or did not happen in 2015 to result in the plaintiff not being transferred to WSDF (a transfer that, apparently, he did not want, since he appealed it) has absolutely nothing to do with whether the defendants transferred the plaintiff to Green Bay in the fall of 2016 to retaliate against him for helping Torgerson sue them.

The court will overrule the plaintiff's objection to Judge Joseph's denial of his supplemental motion to compel.

## IV. Conclusion

The court **OVERRULES** the plaintiff's objections to Judge Joseph's November 22, 2019 order. Dkt. No. 63.

The court **ORDERS** the plaintiff to file his response to the defendants'
motion for summary judgment in time for the court to receive it by the end of
the day on **September 18, 2020.**

Dated in Milwaukee, Wisconsin this 4th day of August, 2020.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**