JOSHUA HOWARD,

        Plaintiff,

  v.

Case No. 17-cv-1353-pp

TONY MELI, JEREMY WESTRA
and CYNTHIA RADTKE,

        Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR EXTENSION OF TIME (DKT. NO. 75), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 25) AND DISMISSING CASE**

Joshua Howard, a Wisconsin state prisoner representing himself, filed this civil rights case under 42 U.S.C. §1983. He alleges that the defendants transferred him from Waupun Correctional Institution to Green Bay Correctional Institution in 2017 in retaliation for his helping inmate Kristopher Torgerson with a civil case. Dkt. Nos. 15, 16. On March 22, 2019, the defendants filed a motion for summary judgment. Dkt. No. 25. On February 8, 2021, the court received the plaintiff's *fourth* motion for an extension of time to respond to that summary judgment motion—the plaintiff's response originally would have been due on April 21, 2021, almost ten months ago. Dkt. No. 75.

## I. Procedural Background and Plaintiff's Motion for Extension of Time (Dkt. No. 75)

The defendants filed their motion for summary judgment and supporting documents on March 22, 2019. Dkt. Nos. 25-37. Under the court's August 21, 2018 scheduling order, the plaintiff's response materials were due in thirty days—by April 21, 2019. (See Scheduling Order, Dkt. No. 13 at ¶2.) On April 1, 2019, however, the court received a request from the plaintiff, asking the court to stay the briefing schedule for summary judgment motions until it had ruled on his discovery motions. Dkt. No. 38. Although the defendants objected, dkt. no. 40, the court issued a ruling resolving the plaintiff's discovery motions and denying his request to stay the summary judgment briefing but giving the plaintiff an extended deadline of August 15, 2019 by which to respond to the motion. Dkt. No. 42. The plaintiff then asked for an extension of the discovery deadline, dkt. no. 44; when the court granted that request, dkt. no. 45, the plaintiff also asked for an extension of time to file summary judgment motions, dkt. no. 46, as well as filing a motion to compel, dkt. no. 47. What followed was a flurry of motions and objections and pleadings, culminating in an October 9, 2019 order from this court referring the case to Magistrate Judge Nancy Joseph for pretrial proceedings. Dkt. No. 62.

On November 22, 2019, Judge Joseph issued an order denying the plaintiff's motion and supplemental motion to compel discovery, granting the defendants' motion for protective order as to Exhibits A and B and granting the defendants' motion to strike Exhibit C. Dkt. No. 63. The court received the plaintiff's objections to Judge Joseph's order on December 16, 2019. Dkt. No.

2

Case 2:17-cv-01353-PP   Filed 02/22/21   Page 2 of 18   Document 76

64. On August 4, 2020, the court overruled the plaintiff's objections to Judge Joseph's order and ordered the plaintiff to respond to the defendants' motion for summary judgment by September 18, 2020. Dkt. No. 68 at 27-28.

Since the court issued that August 4, 2020 order setting the plaintiff's summary judgment response deadline at September 18, 2020, the plaintiff has filed four motions seeking extensions of time to respond to the defendants' summary judgment motion. He filed his first motion for extension of time on September 3, 2020, requesting more time because of lack of movement at Green Bay Correctional Institution due to a COVID-19 outbreak. Dkt. No. 69. The court granted that request and allowed him sixty days—until November 22, 2020—to file his response. Dkt. No. 70.

The court received the plaintiff's second motion for extension of time on November 5, 2020; that motion stated that Green Bay had been on lockdown for the prior two weeks and that the plaintiff had been sick with what appeared to be COVID-19. Dkt. No. 71. The court granted the plaintiff another sixty-day extension, until January 22, 2021, to respond to the defendants' summary judgment motion. Dkt. No. 72.

On January 8, 2021, the court received the plaintiff's third motion for an extension of time. Dkt. No. 73. In this motion, the plaintiff said that due to a lockdown the legal library had opened only in the past month, but that it had been closed for several days due to the holiday and COVID testing, and that the defendants had raised an issue that required the plaintiff to conduct research in the library. Id. The court found that the plaintiff had established good cause

3

for another extension and extended the deadline for filing a response until February 12, 2021. Dkt. No. 74. The court stated, however, that it was unlikely to grant any further extensions absent a showing of good cause. Id.

In his fourth motion for extension of time, received on February 8, 2021, the plaintiff acknowledges that he already has caused a significant delay but says that his mental health downswings, lingering brain-fog from having COVID, sporadic access to the law library and waiting for an attorney to return a document he wants to use an exhibit have contributed to the delay. Dkt. No. 75. The plaintiff says that his response is eighty percent done and that this should be the last time he will require more time. Id.

In the last six months, the plaintiff has filed the following documents in other Eastern District of Wisconsin cases he is or was litigating:

- October 23, 2020 – Plaintiff filed response to summary judgment in Case No. 17-cv-325-pp, Dkt. Nos. 69-72;

- August 24, 2020 – Plaintiff filed amended complaint in Case No. 18-cv-1830-pp, Dkt. No. 12;

- January 8, 14, and 19, 2021 – Plaintiff filed motion to alter/amend order and supporting materials in Case No. 18-cv-1830-pp, Dkt. Nos. 15-18;

- November 18, 2020 – Plaintiff (and co-plaintiff) filed motion to compel and motion to stay in Case No. 19-cv-616-WED, Dkt. Nos. 69-70;

- September 3, 2020 – Plaintiff filed new case, Case No. 20-cv-1366-pp;

- November 30, 2020 – Plaintiff filed new case, Case No. 20-cv-1768-pp; and

- December 15, 2020 – Plaintiff filed new case, Case No. 20-cv-1850-pp.

The plaintiff's fourth motion for extension of time does not mention these other cases or explain how he was able to overcome the obstacles he identifies in his most recent motion to file all the pleadings listed above. Given the fact that the plaintiff has been able to file these documents in his other cases, the court cannot conclude that he has shown good cause for another extension of time in this case. The court previously advised the plaintiff that it was unlikely to grant another extension without a showing of good cause. The plaintiff has not shown good cause and the court will deny his motion for extension of time.

## II. Defendants' Motion for Summary Judgment (Dkt. No. 25)

In his amended complaint, the plaintiff alleges that the defendants had him transferred from Waupun Correctional Institution to Green Bay to punish him for helping another prisoner prepare and file a lawsuit against them, and to impede any further assistance the plaintiff might provide the inmate with that lawsuit. Dkt. No. 16 at 3. The defendants have filed a motion for summary judgment and the plaintiff has not filed a response to the defendants' motion. Under Civil Local Rule 7(d) (E.D. Wis.), if a plaintiff does not respond to a motion for summary judgment, his failure to respond is sufficient cause for the court to grant the motion (in other words, to rule in favor of the defendants). The court could grant the defendants' motion for summary judgment under Civil L. R. 7(d), but for the sake of thoroughness, the court will address the merits of the plaintiff's retaliation claim.

A. Facts[1]

    1. *Parties*

The plaintiff was admitted to Waupun in 2002. Dkt. No. 27 at ¶1. Defendant Anthony Meli is the Security Director at Waupun, and he initiated the plaintiff's transfer to Green Bay in 2017. Id. at ¶3. Defendant Cynthia Radtke, a captain at Waupun, served on the Reclassification Committee that approved the transfer in 2017. Id. at ¶4. Defendant Jeremy Westra, also a captain at Waupun, had no involvement in the plaintiff's transfer. Id. at ¶5.

    2. *Plaintiff's Disciplinary History at Waupun*

In his time at Waupun, the plaintiff has received nine major and forty-one minor conduct reports. Id. at ¶6. The last major conduct report the plaintiff received at Waupun was for Enterprises and Fraud. Id. at ¶7. The plaintiff was found to be in possession of the legal property and materials of thirty other inmates. Id. Investigators determined that the plaintiff was using a third-party account through a company called Prisoner Assistant to conceal his money transactions. Id. Almost $7,000 had been moved through the plaintiff's account at Prisoner Assistant. Id. Several individuals had sent money to this account, including family members of the inmates the plaintiff was assisting with legal work. Id. A third-party individual then channeled the funds from the Prisoner Assistant account back to the plaintiff by making catalog purchases for the plaintiff or for inmates to whom the plaintiff owed money. Id. On October 15,

---

[1] This section is taken from the Defendants' Proposed Findings of Fact, dkt. no. 27, which are undisputed.

2014, the plaintiff was found guilty of Enterprises and Fraud and received a disposition of 120 days in disciplinary separation. Id. at ¶8.

This was the plaintiff's fourth conduct report for Enterprises and Fraud. Id. at ¶9. The plaintiff's earliest conduct report for Enterprises and Fraud, received in 2003, had resulted in a criminal conviction for defrauding phone companies. Id. at ¶10. In 2009, the plaintiff was found guilty of Enterprises and Fraud after he misrepresented facts to gain approval for photocopies that would otherwise not have been approved by library staff. Id. at ¶11. In 2010, the plaintiff was found guilty of Disobeying Orders, Enterprises and Fraud, and Violations of Institution Policies and Procedures after he was found using his court deadline priority library pass to work on other inmates' legal work. Id. at ¶12. He was also found to be engaged in an enterprise in which other inmates were being charged for legal assistance by him through his "CJ Legal Group" company. Id.

### 3. *Referral to Wisconsin Secure Program Facility*

After the plaintiff had finished serving the disciplinary segregation time for his 2014 Enterprises and Fraud conduct report, Security Director Meli initiated a referral for the plaintiff's transfer to the Wisconsin Secure Program Facility (WSPF). Id. at ¶13. Given the plaintiff's repeated conduct reports for Enterprises and Fraud, Meli believed the plaintiff had become too familiar with staff, other inmates and the daily operations of Waupun. Id. at ¶14. He had been at Waupun for too long. Id. Meli believed it would be best to give him a fresh start elsewhere. Id.

The referral to WSPF was approved by Waupun's Psychological Services Unit, Health Services Unit and the Corrections Central office Psychiatrist Director. Id. at ¶16. On April 7, 2015, the plaintiff had a hearing before the Reclassification Committee, and the committee unanimously recommended maximum custody and transfer to WSPF. As its rationale, the committee cited

> the offense severity (multiple counts of Sexual Assault and Prostitution), the inmate's motivation and attitude regarding the offense (denies), continued criminality while incarcerated (2004 case), lengthy sentence, time served, time remaining to serve to PMR (over 70 years), poor institution adjustment, and DAI bed space/security needs.

Id. at ¶19. The committee noted the plaintiff at been at Waupun since 2002. Id. at ¶20.

The day after the hearing, Meli learned that the plaintiff had a "habeas hold." Id. at ¶21. If an inmate's records show he has a "habeas hold," Corrections Central Office must be contacted for an update as to the status of the *habeas* case. Id. at ¶22. The Central Office works with the Wisconsin Department of Justice to determine the status. Id. A *habeas* hold may preclude transferring the inmate at that time. Id. If a transfer is nevertheless necessary for security reasons, Corrections still may transfer the inmate and then work with the Department of Justice to get approval after the transfer. Id. However, Corrections tries to avoid this. Id.

In May 2015, Meli learned that Corrections would not transfer the plaintiff due to the pending *habeas* case. Id. at ¶23. Thus, the plaintiff remained at Waupun.

On July 19, 2016 and August 1, 2017, the plaintiff had routine reclassification proceedings. Id. at ¶25. Defendant Radtke was not on the four-person July 19, 2016 committee; she was on the four-person August 1, 2017 committee. Id. at ¶26. Each proceeding resulted in a recommendation for retention in maximum custody at Waupun. Id. at ¶27.

        4.     *Transfer to Green Bay*

During mid-August 2017, the Green Bay Security Director approached Meli regarding the possibility of an inmate trade, because they had an inmate they needed to transfer. Id. at ¶28. Because the security concern over the plaintiff's length of time at Waupun and his overfamiliarity with the institution had not abated, Meli asked whether the plaintiff could be transferred. Id. at ¶29. Corrections responded that there was no longer a need to maintain a *habeas* hold, and that the plaintiff could be transferred as needed. Id. at ¶30.

An early reclassification hearing was scheduled for the plaintiff on September 29, 2017. Id. at ¶31. Radtke was one of four members on the committee. Id. at ¶32. The committee unanimously recommended continued maximum custody at Green Bay. Id. at ¶33. The recommendation was approved by Offender Classification Specialist L. Fait. Id. at ¶34. The plaintiff was transferred to Green Bay on October 13, 2017. Id. at ¶35.

        5.     *Plaintiff's History with inmate Kristopher Torgerson*

The plaintiff alleges that in 2016–2017, he was helping inmate Torgerson with a civil rights lawsuit Torgerson had filed against Meli, Radtke and Westra, Kristopher Torgerson v. Wall, *et al.*, E.D. Wis. Case No. 16-cv-1432 ('1432).

Dkt. 16 at 2. Inmate Torgerson filed his civil complaint for '1432 on October 25, 2016. The court screened the lawsuit under 28 U.S.C. §1915 and allowed it to proceed on December 1, 2016.

Meli, Radtke and Westra assert that until the plaintiff filed the instant case, they had no idea he was helping Torgerson with '1432. Dkt. No. 27 at ¶36. Around the same time that the plaintiff was helping with the civil lawsuit, he was also planning to help Torgerson at his criminal trial. Id. Starting March 13, 2017, Torgerson had a jury trial in State of Wisconsin v. Kristopher Torgerson, Marathon County Case No. 14-CF-860. Id. at ¶37. The plaintiff was slated to be a witness for the State. Id. Prior to trial, the plaintiff had reported to law enforcement that Torgerson had confessed the murder to him. Id. at ¶38. The State included information on this "confession" in the discovery and listed the plaintiff as a witness for the State. Id.

The day before the plaintiff was scheduled to testify, Torgerson had a recorded visited with two women in the jail. Id. at ¶39. Torgerson told the women they should be in court the next day because the plaintiff was going to do something while on the stand to cause a mistrial. Id. The State used that recording as consciousness-of-guilt evidence and did not call the plaintiff as a witness at all. Id.

> 6. *Plaintiff's and Torgerson's requests to be separated from each other*

Prior to the trial, the plaintiff had written to the state's detective and requested to be separated from Torgerson due to the plaintiff's intention to testify against Torgerson. Id. at ¶41. The letter was forwarded to one of the

10

prosecutors, Assistant Attorney General Richard DuFour. Id. at ¶42. DuFour asked his contact at the Department of Corrections if anything could be done to protect the plaintiff, given that he was planning to testify that Torgerson had confessed to him. Id. at ¶43. The Corrections Security Chief at the time thought a Special Placement need (SPN)[2] or protective confinement might be warranted. Id. at ¶44. He asked Meli to talk to the plaintiff and find out what the plaintiff was asking for. Id.

After the trial, Torgerson submitted a request for an SPN to separate him from the plaintiff; Captain Westra was assigned to investigate it. Id. at ¶¶46-47. Before beginning his investigation, the warden told Westra that the plaintiff had been helping Torgerson in his criminal case. Id. at ¶48.

Westra had a meeting with the plaintiff in June 2017. Id. at ¶49. They spoke in the security suite about Torgerson. Id. at ¶50. Westra asked the plaintiff why Torgerson would want an SPN against him. Id. The plaintiff responded he had no idea. Id. Westra said to the plaintiff, "Aren't you helping Torgerson with his case?" Id. By this, Westra was referring to Torgerson's criminal case. Id. Westra informed the plaintiff that if the SPN was granted, it was possible that the plaintiff could be transferred. Id. at ¶51.

Westra also met with Torgerson. Id. at ¶52. Westra asked Torgerson why he needed the separation, and Torgerson responded, "So he ([the plaintiff]) does

---

[2] An SPN is a restriction which may be put in place if there is the need for physical separation by facility between inmates, physical separation by housing units between inmates within a facility, physical separation by facility between an inmate and a Corrections staff member or physical separation of an inmate from a specific facility. Id. ¶ 45.

11

not hinder my case any further." Id. Westra asked Torgerson how the plaintiff would hinder his case and Torgerson stated, "If I get a retrial he could make more statements against me." Id.

Ultimately, Westra recommended Torgerson's SPN request be denied. Id. at ¶53. The rationale offered by Torgerson did not fit within a reason for which an SPN could be approved. Id. Meli made the final decision disapproving the SPN. Id. at ¶54. Westra does not recall ever talking to the plaintiff at any time other than that one meeting about the SPN. Id. at ¶61.

B. Discussion

1. *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

12

Case 2:17-cv-01353-PP   Filed 02/22/21   Page 12 of 18   Document 76

the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Fed. R. Civ. P. 56(c)(4).

2. *Discussion*

To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment," "(2) he suffered a deprivation that would likely deter First Amendment activity in the future" and there was "(3) a causal connection between the two." Watkins v. Kasper, 599 F.3d 791, 794 (7th Cir. 2010) (quoting Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)). At summary judgment, the plaintiff must "furnish evidence that the defendants were motivated to punish him with materially adverse action because he engaged in constitutionally protected activity." Winston v. Fuchs, ___ F. App'x ___, 2020 WL 7230248, at *2 (7th Cir. Dec. 8, 2020) (citing Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018)).

In support of their motion for summary judgment, the defendants first contend that the plaintiff's claim must fail as a matter of law because helping another inmate prosecute a civil lawsuit is not constitutionally protected conduct. Dkt. No. 26 at 9. The defendants cite an unpublished Seventh Circuit opinion, Perotti v. Quinones, 488 F. App'x 141, 146 (7th Cir. 2012) ("[I]inmates do not have a constitutional right to provide legal assistance to other prisoners."). One of the other judges on this court has relied on the Perotti decision, holding that "there is no binding precedent showing that the plaintiff had an unfettered right to act as a jailhouse lawyer for other inmates." Tate v. Litscher, No. 16-C-1503, 2020 WL 2322852, at *2 (E.D. Wis. May 11, 2020). See also Robinson v. Wallace, No. 19-cv-00560-JPH-MJD, 2020 WL 5544041, at *2 (S.D. Ind., Sept. 16, 2020).

Other Seventh Circuit decisions, however, intimate that inmates may retain some degree of First Amendment protection when they help other prisoners litigate. See Harris v. Walls, 604 F. App'x 518, 521 (7th Cir. 2015) (a prisoner may help another inmate, otherwise unable to help himself, access the courts, but inmates' speech rights on legal matters are not unlimited); Higgason v. Farley, 83 F.3d 807, 810 (7th Cir. 1996) ("If a prisoner is transferred for exercising his own right of access to the courts, or for assisting others in exercising their right of access to the courts, he has a claim under Section 1983."), quoted with approval by Bridges v. Gilbert, 557 F.3d 541, 555 (7th Cir. 2009); see also Shaw v. Murphy, 532 U.S. 223, 231 (2001) (in a case in which the inmate claimed enhanced First Amendment protection for speech

14

that included legal advice, "We thus decline to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech." (emphasis added). The court is reluctant to conclude that the plaintiff's assistance to inmate Torgerson had no First Amendment protection.

The defendants also contend that inmate Torgerson's lawsuit was not a motivating factor in their decision to transfer the plaintiff. Dkt. No. 26 at 14-18. It is undisputed that the defendants did not know that the plaintiff was helping inmate Torgerson with his civil lawsuit when the plaintiff was transferred. Dkt. No. 27 at ¶36. The plaintiff's work with inmate Torgerson on his civil case was not a motivating factor in the plaintiff's transfer to Green Bay. Dkt. No. 26 at 14; Dkt. No. 27 at ¶¶63, 65, 69. The plaintiff was transferred to Green Bay because he was overly familiar with Waupun and because Security Director Meli was offered an opportunity for an inmate trade. Dkt. No. 26 at 14; Dkt. No. 27 at ¶¶14, 29, 68. The record does not support a finding that the plaintiff's assistance to inmate Torgerson motivated any defendant to transfer him to Green Bay. See Winston, 2020 WL 7230248, at *2 (citing Nieves v. Bartlett, ___ U.S. ___, 139 S. Ct. 1715, 1722 (2019) (inmate did not produce enough evidence for a reasonable jury to find that his grievance was the but-for cause of his discipline, so district court properly entered summary judgment)).

The defendants also argue that Westra was not involved in the decision to transfer the plaintiff to Green Bay and had no final authority over transfer decisions. Dkt. No. 26 at 14-15 (citing Dkt. No. 27 at ¶¶55-59). They assert

15

that it appears the plaintiff named Westra as a defendant based on the single conversation he had with the plaintiff when Westra was investigating the plaintiff's SPN request. Dkt. No. 27 at ¶¶60-63. They argue that Radtke had served on the Reclassification Committee on August 1, 2017, and had recommended that the plaintiff *remain* at Waupun; they assert that if she'd wanted the plaintiff transferred, she could have made the recommendation at that time, so no reasonable jury could find that she would have conspired to retaliate against the plaintiff eight weeks later. Dkt. No. 26 at 16 (citing Dkt. No. 27 at ¶66). And they argue that defendant Meli began trying to transfer the plaintiff out of Waupun "years before" the plaintiff helped Torgerson file his civil lawsuit. Id. at 17-18 (citing Dkt. No. 27 at 23-30). The court agrees that based on these facts, no reasonable fact-finder could conclude that any of the three defendants acted in retaliation against the plaintiff for his assistance to Torgerson.

      Finally, the defendants have shown that even if the plaintiff's legal assistance to inmate Torgerson had been a factor in the decision to transfer him to Green Bay, the transfer still would have occurred. Dkt. No. 26 at 18. Any effect the plaintiff's legal assistance to inmate Torgerson may have had on the defendants has "done no work, had no effect, left the world unchanged." Winston, 2020 WL 7230248, at *2 (quoting Greene v. Doruff, 660 F.3d 975, 978 (7th Cir. 2011)).

A reasonable factfinder could not conclude that the defendants retaliated against the plaintiff. Therefore, the court will grant the defendants' motion for summary judgment and dismiss this case.

### III. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 25.

The court **DENIES** the plaintiff's motion for extension of time. Dkt. No. 75.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must

17

be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 22nd day of February, 2021.

                        **BY THE COURT:**

                        **HON. PAMELA PEPPER**
                        **Chief United States District Judge**